Transcript of the Testimony of
# WILLIAM EDWARDS, JR

**Date:** July 23, 2013
**Volume:** I

**Case:** STATE OF OKLAHOMA, ex rel v. STAFFING CONCEPTS
INTERNATIONAL, INC

NATIONAL COURT REPORTERS INC
Phone:888-800-9656
Fax:866-819-2317
Email:mail@nationalcourtreporters.com
Internet: www.nationalcourtreporters.com



EXHIBIT

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

STATE OF OKLAHOMA, ex rel. JOHN
DOAK, INSURANCE COMMISSIONER,
AS RECEIVER FOR PARK AVENUE
PROPERTY & CASUALTY INSURANCE
COMPANY,
and         Case No. 5:12-cv-00409-C
STATE OF OKLAHOMA, ex rel. JOHN
DOAK, INSURANCE COMMISSIONER, AS
RECEIVER FOR IMPERIAL CASUALTY
AND INDEMNITY COMPANY,

      Plaintiffs,

vs.

STAFFING CONCEPTS INTERNATIONAL
INC.,
      Defendant.     /

DEPOSITION OF WILLIAM EDWARDS, JR.
TAKEN BY:    Plaintiffs Herein

DATE:       Tuesday, July 23, 2013

TIME:       9:13 a.m. - 4:11 p.m.

PLACE:     Broad and Cassel
            100 North Tampa Street, Suite 3500
            Tampa, Florida

REPORTED BY:   Linda C. Mead, CCR, CSR
               Notary Public, State of Florida

**Page 2**

1  APPEARANCES:
2  PATRICK H. KERNAN, ESQUIRE
   GREG REILLY, ESQUIRE
3    Newton, O'Connor
    Turner & Ketchum, P.C.
4    15 West Sixth Street
    Suite 2700
5    Tulsa, Oklahoma 74119
      Appearing on behalf of Plaintiffs
6
7  MARK M. BARBER, ESQUIRE
    Broad and Cassel
8    100 North Tampa Street
    Suite 3500
9    Tampa, Florida 33602
      Appearing on behalf of Defendant
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1  DEPOSITION OF: WILLIAM EDWARDS, JR.
2
3                INDEX
4  Examination                Page
5  By Mr. Kernan.............................   4
6
7
                EXHIBITS
8  Description                Page
9  1, Deposition Notice.......................   8
10  2, Certificate List........................   84
11  3, Loss Run................................   88
12  4, Reitz/Klimek E-mails 5/9/07............. 120
13  5, Hardin/Lancaster E-mail 7/7/09.......... 149
14  6, Hardin/Lancaster E-mails 8/17/09........ 150
15  7, Lancaster/Klimek E-mails 1/14/08........ 157
16  8, Foley/Lancaster E-mails 8/10/25......... 158
17  9, Lancaster/Klimek E-mails 2/8/08......... 159
18  10, Sullivan/Gober E-mails 4/23/09......... 160
19  11, Sullivan/Gober E-mail 1/29/10.......... 161
20  12, Sullivan/Gober E-mail 2/3/10........... 162
21  13, Sullivan/Gober E-mail 2/26/10.......... 164
22  14, Sullivan/Gober E-mail 3/8/10........... 165
23  15, ICIC Loss & ALAE Summary............... 166
24
25

**Page 4**

1             PROCEEDINGS
2             * * * * *
3
4        WILLIAM EDWARDS, JR.,
5  a Witness herein, having been first duly sworn to tell
6  the truth, the whole truth, and nothing but the truth,
7  testified and said as follows:
8           EXAMINATION
9  BY MR. KERNAN:
10    Q   Would you state your name for the record,
11  please.
12    A   Billy Edwards, Jr.
13    Q   Mr. Edwards, where do you live?
14    A   I live in Ruskin, Florida.
15    Q   And what is your occupation or profession?
16    A   Attorney.
17    Q   And do you practice in a law firm or by
18  yourself?  Where do you practice?
19    A   I have a law firm and I also work as general
20  counsel for the SCI companies.  And that's an in-house
21  position.
22    Q   Is your law firm outside the SCI general
23  counsel position?
24    A   Yes.
25    Q   What's the name of your law firm?

Page 5

1     A    Dominguez & Edwards.
2     Q    I'm vaguely familiar with the name Dominguez
3    as appearing on some of these documents.  Is this the
4    same person that's also involved with SCI?
5     A    J.C. Dominguez, yes.
6     Q    Okay.  And how long have you been practicing
7    law, Mr. Edwards?
8     A    Since 2002.
9     Q    How old a man are you, sir?
10    A    I am 36.
11    Q    How long have you been general counsel for
12   SCI?
13    A    I've been general counsel since 2009.  I have
14   worked there since 2004.
15    Q    When you say SCI, you're referring to
16   Staffing Concepts International, Inc.?  Is that the
17   full name of the --
18    A    That's one of the SCI companies, yes.
19    Q    So is SCI a d/b/a for Staffing Concepts
20   International or is SCI a holding company?
21    A    SCI is a trade name.
22    Q    Okay.
23    A    It's used to refer to Staffing Concepts
24   International on some level, but it's primarily just a
25   brand name for our PEOs.

Page 6

1     Q    Okay.  The PEOs that are clients of Staffing
2    Concepts International, Inc.?
3     A    Are Venture Resources Group and Staffing
4    Concepts National.
5     Q    Okay.  Are those PEOs that are owned by SCI?
6     A    By Staffing Concepts International.
7     Q    Okay.  And SCI is just a trade name for
8    Staffing Concepts International, Inc.?
9     A    It refers to all of the SCI PEOs.
10    Q    Okay.  Before you became general counsel in
11   2009, what did you do at SCI?
12    A    Corporate counsel.  Just another attorney
13   there.
14    Q    Did SCI have -- That makes it sound like SCI
15   had more than one lawyer in-house.
16    A    Correct.
17    Q    How many lawyers did it have?
18    A    When I started we had three, including J.C.
19   Dominguez and Jane Phillips.
20    Q    Okay.  That was back in 2004?
21    A    Correct.  Although J.C. was focused primarily
22   on the business side as opposed to legal at the time I
23   started.
24    Q    Okay.  When you became general counsel in
25   2009, did you have other lawyers in-house that were

Page 7

1    working for you?
2     A    I had one other attorney at the time.
3     Q    And his or her name?
4     A    Aimee, A-i-m-e-e, Eberst, E-b-e-r-s-t.
5     Q    When you started with SCI in 2004,
6    Mr. Edwards, roughly how many employees did SCI have?
7     A    I don't know.
8     Q    Do you have an approximate number?
9     A    More than 100.  Possibly between 100 and 150.
10    Q    Okay.  Thank you.
11         Back in 2004, who was the president or chief
12   operating officer of Staffing Concepts International,
13   Inc.?
14    A    Henry C. Hardin, III.  Hardin is H-a-r-d-i-n.
15    Q    And what was his title?
16    A    President and CEO.
17    Q    Is Mr. Hardin still the president and CEO of
18   Staffing Concepts International, Inc.?
19    A    Yes.
20    Q    And the general counsel in 2004, did you tell
21   me it was Jane Phillips?
22    A    She was one of the attorneys.  I don't know
23   that her title was general counsel at that time.  She
24   may have had a corporate counsel title.  I don't think
25   she actually got the title general counsel until later.

Page 8

1     Q    Okay.  Do you know when Staffing Concepts
2    International, Inc., Mr. Edwards, was formed, when it
3    began business?
4     A    Approximately -- I don't.  I can't tell you
5    off the top of my head.  Sorry.
6     Q    Roughly?
7     A    Somewhere between '85 and '91.  It's been in
8    business in one iteration or another, SCI companies has
9    been, since '85.
10    Q    Do you know when Staffing Concepts
11   International first started doing business with
12   Providence Property & Casualty Insurance Company?
13    A    2003.
14    Q    Am I to understand that predated your --
15    A    That is correct.  Sorry, I didn't let you
16   finish.
17    Q    Do you know who with Staffing Concepts
18   International made the initial contacts with people at
19   Providence Property & Casualty Insurance Company?
20    A    It's my understanding it was J.C. Dominguez.
21         (Exhibit 1 was marked.)
22   BY MR. KERNAN:
23    Q    Let me hand you what I've marked as
24   Exhibit 1, Mr. Edwards, and ask you if you have seen
25   that notice before?

Ex 1

2  (Pages 5 to 8)

Page 9

1    A   I have seen the notice of deposition.
2    Q   Am I to understand that you're designated to
3  speak on behalf of Staffing Concepts International,
4  Inc. in connection with those areas?
5    A   That is correct.
6    Q   Can you tell me what you've done to prepare
7  to provide testimony today.
8        MR. BARBER:  I'll just object to interpose
9    attorney-client privilege and instruct the witness
10   to answer only to the extent that it doesn't
11   require you to divulge the content of confidential
12   discussions with me or anybody else at the law
13   firm.
14       THE DEPONENT:  Primarily the pleadings.
15   BY MR. KERNAN:
16   Q   All right.  And so am I to understand that
17  you have read the pleadings and that in addition
18  to talking to your lawyer, Mr. Barber, would be what
19  you've done to prepare?
20   A   That's fair.
21   Q   All right.  Do you know how the first contact
22  with SCI and Providence Property & Casualty Insurance
23  Company was made, who made it, back in 2003?
24   A   Jerry Lancaster and J.C. knew each other
25  through PEO-related networking gatherings is my

Page 10

1  understanding.
2    Q   Okay.  Do you know any more about it than
3  that?
4    A   I do not.
5    Q   Do you know anything, Mr. Edwards, about the
6  history of Providence Property & Casualty Insurance
7  Company before SCI started doing business with it?
8    A   I do not.  The only thing I can speak to
9  specifically is that I recall that Derek Lancaster was
10  president, and I thought that was odd because Jerry did
11  all the talking, Lancaster.
12   Q   Okay.  Anything else that you --
13   A   Nothing that sticks out.
14   Q   And when you say Jerry did all the talking,
15  is that when you first got on board in 2004 and met
16  Mr. Lancaster?
17   A   Correct.
18   Q   And tell me, if you remember, what your first
19  experience -- when it was with Jerry Lancaster.
20   A   It would have been in 2004, approximately
21  between June and -- between June and -- probably
22  between June and September of 2004.
23   Q   Okay.  And was this a business meeting?
24   A   Yes.
25   Q   Do you remember where it took place?

Page 11

1    A   It took place in Georgia at our office at the
2  time.  That was I believe in Duluth, Georgia.
3    Q   Okay.  Do you recall what the purpose of the
4  meeting was with yourself and Jerry Lancaster and
5  probably -- Were there others involved in the meeting?
6    A   There were others there.  J.C. Dominguez,
7  Henry Hardin and Derek Lancaster.
8    Q   Okay.  Do you remember what the purpose was?
9    A   I don't remember the details.  I was really
10  new to SCI at the time and basically just there to
11  observe.
12   Q   Sure.  Do you have any notes or documents
13  that reflect that meeting?
14   A   I do not.
15   Q   Do you know who SCI, Staffing Concepts
16  International, Inc., was using for its workers'
17  compensation insurance before Providence Property &
18  Casualty Insurance Company in 2003?
19   A   CNA.
20   Q   And was CNA the only comp carrier that SCI
21  was using, if you know?
22   A   I believe so.  I'm not exactly sure when AIG
23  was in the picture, but CNA was the primary carrier
24  prior to Providence.
25   Q   Do you know what happened to CNA or why SCI,

Page 12

1  Staffing Concepts International, Inc., stopped using
2  CNA?
3    A   I do.
4    Q   What happened?
5    A   CNA stopped writing PEO business.
6    Q   Okay.  And am I to understand then that
7  Staffing Concepts International, Inc. was needing to
8  find a workers' comp carrier in 2003?
9    A   That is correct.
10   Q   Do you know what other insurance companies
11  SCI may have contacted or discussed?
12   A   Zurich.
13   Q   Any others of which you're aware?
14   A   Not that I'm aware of.
15   Q   I'm going to try to pull some agreements out
16  in chronological order.  I may -- I may not get it
17  right, but --
18       I'm going to pull one under Tab 31 and Tab
19  38.
20       I'm going to try to get some documents
21  identified today here, Mr. Edwards.  Let me start with
22  what I think is the first thing that got signed, but
23  maybe not.
24       Let me hand you, first of all, a proof of
25  claim.  It looks like proof of claim Number PAPC00383

3  (Pages 9 to 12)

Page 13

1  Is that what you have there?
2      MR. REILLY: Go to the second one. There's
3  two documents in the binder clip.
4  BY MR. KERNAN:
5      Q   Would you take a moment and just kind of look
6  over that real quick. I'm not asking you to study
7  every single page, I just want you to be familiar with
8  it.
9      A   Okay.
10     Q   Are you -- Are you familiar with this proof
11  of claim that was filed on behalf of Staffing Concepts
12  International on -- it looks like it has a received
13  date of February 17, 2011? Are you familiar with this
14  document?
15     A   I am.
16     Q   Did you help prepare it?
17     A   I did.
18     Q   I want to go to Exhibit B, Mr. Edwards. Are
19  you familiar with this surplus loan agreement that's
20  attached to the SCI proof of claim?
21     A   I am.
22     Q   If I'm understanding you, you were not
23  employed at SCI at the time this particular document
24  was signed; is that correct?
25     A   I was not.

Page 14

1      Q   If I'm understanding, Henry Hardin was the
2  president and CEO at the time, correct?
3      A   Correct.
4      Q   And there were -- there were some corporate
5  counsel. I wrote down Jane Phillips, but I wrote down
6  three lawyers. Were there -- Was there a staff of
7  lawyers in-house in 2003 for SCI, if you know?
8      A   In 2003 Jane -- Jane Phillips and J.C.
9  Dominguez. And J.C. was, I believe, operating more in
10  a business role than an attorney role.
11     Q   Okay.
12     A   At one point we had another attorney, Rob
13  Genders briefly, but I don't recall his dates of
14  employment.
15     Q   Okay. Would it be your belief that this
16  agreement, this Exhibit B agreement, that it's signed
17  by Henry Hardin, correct?
18     A   Page four appears to have his signature.
19     Q   Would it be your belief that Mr. Hardin would
20  have had Jane Phillips and probably J.C. Dominguez look
21  at this agreement with him or for him before he signed
22  it? Would that be your expectation?
23     A   I would expect that J.C. would have reviewed
24  it.
25     Q   All right. And do you -- Are you aware who

Page 15

1  the two parties are that is part of this agreement?
2      A   On page one it refers to Staffing Concepts
3  International and it also refers to Providence
4  Holdings, Inc.
5      Q   Okay. Do you know what Providence Holdings,
6  Inc. is?
7      A   I do not.
8      Q   Are you aware that it's a holding company --
9  a separate entity from Providence Property & Casualty
10  Insurance Company?
11     A   I understand that that may be the case, but
12  I'm not familiar with their corporate structure.
13     Q   Are you -- Have you read this surplus loan
14  agreement before as part of your duties?
15     A   I have read it, yes.
16     Q   Are you aware that the money that was loaned
17  by Staffing Concepts International to Providence
18  Holdings, Inc. was $2,285,000? Do you see that?
19     A   I see the amount. I'm not aware of it being
20  actually a loan, but I do see the amount $2,285,000.
21     Q   Do you see that the document contemplates a
22  loan from Staffing Concepts International, Inc. to
23  Providence Holdings, Inc. of $2,285,000?
24     A   I see that the title of the agreement is
25  surplus loan agreement.

Page 16

1      Q   Do you agree that this document reflects a
2  loan?
3      A   No, I don't. This was set up for collateral.
4      Q   Does it say something about collateral in the
5  document?
6      A   The surplus loan agreement is titled surplus
7  loan agreement.
8      Q   Do you -- Do you see what the money was to be
9  paid for -- was to be used for there in the third
10  whereas clause, those four paragraphs?
11     A   I can read that, but I also have seen the
12  letter agreement from 2003 that refers to this as
13  collateral.
14     Q   All right. Well, my question is do you see
15  in the third whereas the four uses for these what are
16  described in the document as borrowed funds? Do you
17  see those four?
18     A   Yes.
19     Q   Do you have any -- Do you have any indication
20  that the borrowed funds were not used for one of
21  those -- one or more of those four purposes set forth
22  in that -- in the first page of this agreement?
23     A   I don't know what the Lancasters used it for.
24  I know what it was supposed to be used for, but I don't
25  know what they actually used it for.

1   signature and he's signing as the underwriter.  And to

2   my knowledge he was the president and CEO of Imperial

3   and Providence Property & Casualty, and here he's

4   signing as the underwriter, which is -- I'm not sure

5   which entity he's representing here.  It just struck

6   me.

7        Q     Okay.

8        A     I apologize for not recognizing that, but as

9   underwriter it didn't --

10       Q     That's fine.  My question is, does Staffing

11  Concepts International, Inc. have an agreement that

12  contains different or other provisions in addition to

13  1371 through 1387 that relates to writing insurance

14  from April of 2009 through April of 2010?

15       A     Of course there would have been the policies

16  themselves and anything else that -- I haven't seen a

17  proposal with additional terms, or at least you haven't

18  given me one today that has additional terms for this.

19  So can I specifically point you to other specific

20  documents for this time frame?  No.

21       Q     All right.  Who was the person that primarily

22  dealt with claims handling, claims issues for Staffing

23  Concepts International?  Let's go back to 2003 when

24  Staffing Concepts International first contracted with

25  Providence Property & Casualty Insurance Company.

1     A    We had a very small staff that would have

2   dealt with claims.  Chris Sullivan is the -- I don't

3   know what his title was at the time, but director of

4   risk management.  And he wouldn't have been in any sort

5   of detailed level of claims.  There was an admin person

6   that reported to him that received claims

7   communications, and that was Michele, I believe it's

8   M-i-c-h-e-l-e, Entin, E-n-t-i-n.

9     Q    I'm sorry.  Would you do that last name

10  again.

11    A    E-n-t-i-n.  For 2003.

12    Q    Let me just take Chris Sullivan.  Is he still

13  here with Staffing Concepts International, Inc.?

14    A    He works for Risk Management Underwriters and

15  they provide services to Staffing Concepts

16  International.

17    Q    All right.  At some point did he leave

18  Staffing Concepts International and go to a company

19  called Risk Management Underwriters?

20    A    He began working for them in January of this

21  year.

22    Q    That would be 2013?

23    A    Correct, 2013.

24    Q    Is Risk Management Underwriters affiliated

25  with Staffing Concepts International, Inc.?

1      A    They provide services for the SCI companies.

2      Q    Okay.  Do they provide services for any other

3   companies besides the SCI companies?

4      A    I believe so.  And I could not -- Well,

5   actually I know they do, yes.

6      Q    Okay.  Who -- Do you know who owns Staffing

7   Concepts International, Inc.?  Is it Mr. Hardin?

8      A    Mr. Hardin owns more than 90 percent of it

9   and a gentleman by the name of Juan Carlos Cuello owns

10  less than 5 percent, probably about 3 percent and

11  change.  His last name is spelled C-u-e-l-l-o.

12     Q    You're pretty good.

13          Does Mr. Cuello participate in the business?

14     A    No, not at all.

15     Q    And does Mr. Hardin own Risk Management

16  Underwriters as well?

17     A    He may.  He may.  I'm not as involved with

18  that.

19     Q    All right.  Let me go back to this document

20  1097 -- Or strike that.

21          Before I go back and talk about these claims,

22  does Staffing Concepts International, Inc. have another

23  agreement between the parties, a written agreement,

24  that I have not provided you and we have not talked

25  about today?

1       A    There are probably handling instructions that

2    Providence would have that are specific to our account.

3    I don't have those.  Providence would have those.  They

4    kind of adapt over time.  But there would be handling

5    instructions that were agreed upon.

6       Q    Okay.  Handling instructions like how to send

7    money in, wiring instructions, is that what you're

8    talking about?

9       A    No, not at all.  For the actual handling of

10   the claims.  You know, what sort of contact as a

11   customer of Providence we expect related to claims, how

12   those -- how the claims are reported to the carrier,

13   any sort of specific input that we want to have and at

14   what levels, things like that, would be covered by the

15   handling instructions.   *SCI Handling Instructions*

16      Q    Okay.  Do you have a copy of those handling

17   instructions that we can mark?

18      A    I do not.  And I don't know that Mark -- I

19   don't believe Mark does either, so I don't believe we

20   have those.

21      Q    Is there anything about those handling

22   instructions that Staffing Concepts International, Inc.

23   believes was breached or is relevant to the accounting

24   and numbers involved in this case?

25      A    Generally the handling instructions

1    incorporate best practices for claims adjusting on some

2    level.  It may vary somewhat, but generally a best

3    practice is sort of instructions in addition to client

4    specific instructions.  And so, yes, I would say that

5    it's fair to say that Providence or its affiliates

6    mishandled claims.

7         Q    Okay.  Let's take the -- And if I'm

8    understanding today at your 30(b)(6) deposition

9    Staffing Concepts International, Inc. cannot identify

10   for the record any underwriting or handling

11   instructions or best practices that it believes was

12   breached by Providence Property & Casualty Insurance,

13   correct?

14        A    I don't know what their underwriting policies

15   were.  I don't know what their underwriting obligations

16   are from a licensure prospective.  I can't speak to

17   those specifically.  The claims handling instructions I

18   can -- I can speak to the best practices certainly, but

19   I don't have the claims handling instructions in front

20   of me.  They would be standard.

21        Q    Let me try it again.  I think it's a yes or

22   no question -- or answer.  But Staffing Concepts

23   International, Inc. today does not -- cannot identify

24   and provide at this deposition handling instructions

25   and/or best practices guidelines that it believes were



Page 65

1    breached by Providence Property & Casualty Insurance,

2    correct?

3         A    I cannot provide them.

4         Q    Okay.  Let's take the first year.  And I'm

5    going back to 1097 to 1100, Mr. Edwards.  The first

6    year under the insurance agreement between SCI and

7    Providence Property & Casualty Insurance Company was

8    April 1st of 2003 through March 31st of 2004, am I

9    right?

10        A    I don't believe that's correct.

11        Q    All right.  Tell me what's --

12        A    I believe it's April 30th, 2003 through

13   April 30th, 2004.

14        Q    All right.

15        A    To my recollection.

16        Q    All right.  That first year, does Staffing

17   Concepts International, Inc. have some testimony today

18   that claims that were administered -- Strike that.

19             Does Staffing Concepts International, Inc.

20   contend in this lawsuit that there were workers'

21   compensation claims that were submitted to Providence

22   Property & Casualty Insurance Company between

23   April 30th, 2003 and April 30, 2004 that were simply

24   not administered, they weren't paid, just went

25   through -- into a black hole?



1      A     Not paid at all or administered at all?

2      Q     Right.

3      A     I'm not aware of any.

4      Q     All right.  Does SCI today have any claims

5    that were submitted to Providence Property & Casualty

6    Insurance Company during that first year, April of

7    '03 to April of '04, that it believes were improperly

8    handled by Providence Property & Casualty?

9      A     There were claims that were improperly

10   handled during that time frame, yes.

11     Q     All right.  I'm ready for the first one.

12     A     To provide you with a claim-by-claim listing,

13   I cannot do that today.  I can speak to the overall and

14   I can speak to a few of the cases that resonate with me

15   that I remember over the course of the relationship

16   with Providence.

17     Q     Why can't Staffing Concepts International,

18   Inc. provide us with a detailed claim-by-claim listing

19   and the information relevant to those claims that it

20   believes were improperly handled during that first

21   year?

22     A     That's an easy one.  I don't have access to

23   the claims files.

24     Q     Okay.  Well, you have access to the files

25   that SCI has, correct?

1        A     The limited files that we keep on them.

2        Q     Did SCI get an invoice and a loss run that

3    reflected all of the payments made on every single

4    claim?  Did SCI get that every month, Mr. Edwards, from

5    2003 forward?

6        A     What we got was a sum total.  It does not

7    break out the specific payments.

8        Q     Have you looked at the information that the

9    Receiver has provided in the course of this discovery?

10       A     I have.

11       Q     And your testimony here today as the 30(b)(6)

12   witness is that SCI is simply not able to identify

13   those claims which it contends were improperly

14   administered?  Is that the testimony today?

15       A     I can identify a few of them.  There's the

16   "A" Claimant 1        claim.

17       Q     SCI, I want to get this for the record, has

18   reviewed all of the documents, all the material that

19   the Receiver has provided to date, correct?

20       A     I have not reviewed every page by page, no.

21       Q     Well, I'm not asking about --

22       A     I have --

23       Q     -- you, Mr. Edwards, I would doubt seriously

24   if that's part of your job description, but my question

25   is as the 30(b)(6) witness has SCI caused those

1   documents to be reviewed so that it can determine what,

2   if any, claims it contends were improperly adjusted?

3       A    We have reviewed the documents received from

4   the Receiver.

5       Q    All right.  And aside from the claims that

6   you're able to testify about orally, which we're going

7   to get into here in a few minutes, SCI does not have a

8   listing -- a specific identification of all claims that

9   it contends were improperly administered, correct?



10      A    Correct.

11      Q    All right.  Does SCI -- Can you point me --

12  Let's stay with the first year.  And we'll get to your

13  oral statements here about claims in just a minute, but

14  let's stay with the first year.  Does SCI have some

15  documents in its records that reflect complaints made

16  by SCI to Providence Property & Casualty Insurance

17  Company between April '03 and April '04 about claims?

18  Do you have some documents that reflect that?

19      A    We do, and we're in the process of compiling

20  them.

21      Q    All right.  Do you have any of those

22  available for me to talk to you about this morning?

23      A    I do not.

24           MR. KERNAN:  Off the record.

25           (Discussion was held off the record.)

1            MR. KERNAN:  Back on the record.

2    BY MR. KERNAN:

3        Q    All right.  Mr. Edwards, what you're telling

4    me is that SCI is in the process of having its staff

5    people look at the claims submitted from April '03 to

6    whenever claims stopped being submitted and provide the

7    Receiver with a list of those documents that reflect

8    complaints made by SCI to Providence Property &

9    Casualty; is that correct?

10       A    That's correct, for the specifics.

11       Q    All right.  Have you seen any documents as

12   you sit here today that reflect complaints made by SCI

13   to Providence Property & Casualty Insurance Company

14   about claims?

15       A    Yes.  Over a period of time I have seen

16   e-mails, had e-mails forwarded to me, that contain

17   complaints.

18       Q    All right.  And those would have been

19   probably e-mails from either Chris Sullivan or Michele

20   Entin to you where they had e-mailed someone at

21   Providence about a claim?

22       A    Well, actually you only asked me about the

23   2003 claims people.  We've had subsequent claims

24   employees.

25       Q    Okay.  Tell me -- Tell me the subsequent

1    claims employees.  And you're right, I stopped at 2003

2    and 2004.

3          A     Yeah.  The list -- In 2004 in approximately

4    June we hired Jennifer Johns.

5          Q     All right.

6          A     And she is or has been responsible for claims

7    for many years on a more detailed sort of basis.

8          Q     All right.  Is she still here?

9          A     She works for Risk Management Underwriters.

10         Q     Okay.  Still doing the claims for --

11         A     Less of the claims administration, but yes.

12         Q     Okay.  Jennifer Johns.

13         A     Timothy Christy.

14         Q     When did he come on board?

15         A     He was late 2003, early 2004.  He was

16   probably -- I think he was hired before Jennifer, and

17   he stayed about a year and a half.  So probably through

18   2005.  He worked primarily on CNA claims, old CNA

19   claims, as opposed to Providence.  But he had some

20   crossover.

21         Q     All right.

22         A     Amanda Barreto has been with SCI for about

23   five, five to six years.

24         Q     B-o --

25         A     B-a-r-r-e-t-o.  At the time she was hired she

1   was either Amanda Perez, P-e-r-e-z, or at other times

2   Amanda Perez-Chang, C-h-a-n-g.  And I hope I spelled

3   her current last name correct.

4        Q    Okay.  Anybody else that you can do word

5   searches and try to find e-mails?

6        A    Diana Christy also worked in claims.  Tiffany

7   Rodriguez worked on our return-to-work program.

8        Q    Okay.  Anybody else?

9        A    There may have been a few others that came

10  and went over the years.  I can't recall the others,

11  but we've had some that have been short-term that have

12  either lasted a year or less that I know I'm not

13  recalling.

14       Q    All right.  In your preparation for this

15  deposition or as part of your job functioning, have you

16  looked at some of these e-mails from these individuals

17  that you've just talked about to various people at

18  Providence Property & Casualty that are raising issues

19  about claims handling?

20       A    Unfortunately I'm relying on -- to a large

21  degree on memory of things that I have seen.  And I

22  have seen some things as we started the compiling

23  process related to, you know, in the very recent past.

24       Q    All right.  Do you recall and have you

25  reviewed the records of SCI to determine whether in the

1   first year, from April 30, '03 to April 30, '04, that

2   first year, whether or not there were any claims,

3   invoices submitted to SCI that were not paid because of

4   some objection to the claim or a payment being made

5   under the claim?  Do you recall any -- any claim that

6   wasn't paid by SCI because of that?

7        A    I do not.

8        Q    Going to the next one.  This would have been

9   April 30 of 2004, may have been May 1st, whatever, but

10  it's from April 30, '04 to April 30, '05, that was the

11  second year, correct?

12       A    '04 to '05, yes.

13       Q    That would have been the second year of

14  coverage?

15       A    Correct.

16       Q    And again, do you recall, based on your

17  review of the records and your job description, whether

18  SCI refused to pay a claim on any of these workers'

19  compensation claims because SCI thought the claim had

20  been improperly handled?

21       A    No.

22       Q    From April -- And again, I'm saying April, it

23  probably technically is midnight May 1st, I'm not doing

24  that deal, April 30th of '05 to April 30th of '06 would

25  have been the third year --

1      A     Right.

2      Q     -- am I correct?

3      A     That's correct.  And I believe they used

4   12:01 on April 30th as the...

5      Q     During the third year, Mr. Edwards, from '05

6   to '06, April 30, '05 to April 30, '06, the third year,

7   do you recall a claim that was invoiced by Providence

8   Property & Casualty where SCI said we're not paying

9   this particular claim because we think it's been

10  overpaid, mishandled or something?

11     A     I know complaints were raised regarding

12  several of the individuals involved and sent to, for

13  example, Michael McClellan.  Julie Salcedo.  Carol

14  Schwartz.  Rosa Garcia came up time and time again as

15  being problematic.  I think she was a claims adjuster

16  that didn't have a great deal of Florida experience.

17  But as far as that impacting whether or not we paid the

18  invoices, no, but yes, we did complain.

19     Q     Okay.  I got confused on that answer.  Were

20  you giving me names of Claimants or were you giving me

21  names of adjusters at Providence Property & Casualty?

22     A     Claims managers and adjusters.

23     Q     At Providence?

24     A     At Providence.

25     Q     Okay.

1     A     They had been Cebcor, some of them,

2     C-e-b-c-o-r.  I don't know exactly how Cebcor became

3     Providence's handling people.

4     Q     All right.  In your antidotal recollection,

5     in other words, you don't have a list, you don't have a

6     document, you're recalling just on your memory, you

7     recall that there were claims made in the third year,

8     April '05 to April '06, to these various adjusters at

9     Providence?

10     A     There were complaints made during all years

11     about the handling to my knowledge, to the best of my

12     knowledge.

13     Q     All right.  Well --

14     A     Because part of the thing is that when you

15     have a -- If you'll permit me to provide a brief

16     explanation.

17     Q     Sure.

18     A     The policy period may be April 30th, 2003

19     through April 30th, 2004, for example, but you may not

20     get a claim until -- whether it comes in during that

21     claim period or it comes in after, you know, the rare

22     instance of late reporting, but the issues regarding

23     the handling of that claim come up over a longer period

24     of time.  So you may have a claim, and you're right to

25     point out the policy year, that it occurs during the

Page 75

1    policy year, but the complaint about the claims

2    mishandling doesn't come up until later.

3         Q    Okay.  I appreciate that.  And I do

4    understand that.

5              I think the testimony so far, since we don't

6    have documents that reflect actual claims that SCI

7    believes were not handled right, that in the first two

8    years SCI does not recall refusing to pay a claim, an

9    invoice, that had claims losses, claims bills on it

10   because SCI concluded that the claim was not handled

11   right?  I believe we've got that established, correct?

12        A    I'm not aware of any invoice that we didn't

13   pay because of claims handling during those initial

14   time frames.

15        Q    All right.  In the third year, again the same

16   question.  I understand now that you believe that there

17   were complaints made about the handling of certain

18   adjusters that Providence used, you named them, I

19   didn't make a list, but you named them, that there were

20   complaints made about the way they handled certain

21   claims; am I right?

22        A    That is correct, yes.

23        Q    Okay.  We just don't -- We just don't have an

24   identification of those claims, correct?

25        A    Not with me today, no.



1       Q    All right.  Nor do we have any kind of

2   empirical information about the amounts of monies that

3   SCI was claiming was improperly spent?

4       A    Correct.

5       Q    Okay.  In the third year, the same question.

6   Am I correct that SCI did not --- did not refuse to pay

7   a claim, an invoice, a monthly invoice, because it

8   contended a claim was improperly administered?

9       A    That's correct.

10      Q    Okay.  Going to April of '06 to April of '07,

11  which would have been the fourth year.  Again, as you

12  sit here as the 30(b)(6) representative, does SCI

13  recall refusing to pay a claim that was invoiced to it

14  during this fourth year because it contended the claim

15  was not properly administered?

16      A    No.

17      Q    All right.  Going to April of '07 to April of

18  '08, which is the fifth year, correct, sir?

19      A    Correct.

20      Q    And again, do you recall as you sit here as

21  the 30(b)(6) witness any claims that SCI got billed for

22  on a monthly basis that SCI just flat dab said I'm not

23  going to pay it because the claim is improperly

24  administered?

25      A    I do not.  Keep in mind, that these are

1    summary invoices that we get that do not provide the

2    detail.

3         Q     Do you recall in April of '08 to April of

4    '09, this would have been the sixth year, again -- Do

5    you have any evidence that indicates that SCI refused

6    to pay a claim submitted to it during this sixth year,

7    April '08 to April '09, because it, SCI, contended the

8    claim was improperly administered?

9         A     No, I don't have anything specific.

10        Q     All right.  Going to April of '09 to April of

11   '10 -- or April of '10, the seventh year, were there --

12   insurance was still being written during that time

13   period, correct, sir?

14        A     Yes.

15        Q     Claims were still being filed and

16   administered?

17        A     Correct.

18        Q     Do you recall any invoices, monthly invoices,

19   that SCI refused to pay in this seventh year because

20   the claims were improperly administered?

21        A     I don't.

22        Q     All right.  Do you have -- Do you know

23   whether there were claims from April -- Well, yeah, I

24   guess they're still going on, right, even as we sit

25   here today?  There are still claims being administered

1      one way or another either on open claims or are there

2      new claims that are being filed?

3          A     No new claims.

4          Q     Okay.

5          A     But there are open claims, yes.

6          Q     All right.  Well, then let me take it from

7      April '10 to April '11.  It would have been the eighth

8      year.  Do you recall claims that are being administered

9      that SCI has refused to pay the bill on because they

10     contend that the claim was improperly administered?

11         A     I'm sorry, you're referring to what time

12     frame?

13         Q     April '10 to April '11, the eighth year.

14         A     I know that during that time frame we have

15     had disputes over loss runs and other specific issues.

16     For example, in March of 2010 we received a loss run

17     from Michael McClellan, and I apologize I do not know

18     how to spell his last name, but from Michael McClellan

19     that the reserves doubled in one month between February

20     and March.

21               And Amanda and Jennifer, Amanda Barreto and

22     Jennifer Jones, both raised that issue with Michael

23     McClellan as far as specific things that were going on

24     there.  It's a red flag when your loss run --- your

25     reserves double in a month.

1        Q     Okay.  Do you have some documents, some

2    communication, letters, printouts, anything, that

3    memorializes this issue you just talked about?

4        A     Yes.  We will and we will provide them.

5        Q     Do you have them here today?

6        A     I don't.

7        Q     All right.  You mentioned, Mr. Edwards, that

8    you can recall some claims that you believe were

9    improperly managed just by your memory; is that

10   correct?

11       A     And some of the documents that I have -- we

12   started to review as we're compiling.  We haven't

13   gotten as far through that to compile those.

14       Q     All right.  Do you have any documents that

15   you've compiled available for me to ask you questions

16   about today?

17       A     No.

18       Q     All right.  Well, then we can deal with that

19   issue later, but just tell me then what your memory is

20   of claims, and the subject is claims, that SCI believes

21   Providence Property & Casualty Insurance Company and

22   after receivership the State Guarantee Associations,

23   either or both, that you believe have not been properly

24   administered?

25       A     The --

1     Q     Let me make a list of them.  Number one --

2     A     One that comes to mind is A        ., "A" - claimant 1

"JC" - Claimant 2

3   A-  _      .  The J   h      claim.          "A" - claimant 1

4     Q     Okay.  Just a moment.  A-        .?

5     A     Correct.  That's the last name.

6     Q     Sir?

7     A     That's the last name.

8     Q     All right.  Do you know roughly when the

9   claim was made off the top of your head?

10    A     I don't.

11    Q     You don't know whether it was '03 or '10?

12    A     I can't -- I can't remember when it was first

13  made, no.

14    Q     All right.  Do you know any of the details

"A" Claimant 1

15  other than A        '  Do you know how much money SCI

16  contends should not have been paid or should have been

17  paid or what --

18    A     I recall that it was a litigated claim that

19  went on for an extended period of time that was poorly

20  managed to closure, if it is closed even now.  I'd have

21  to verify that.

22    Q     Okay.  And when you say "poorly managed to

23  closure," are you getting that information from

24  Jennifer?

25    A     I'm getting it from -- I'm getting it from

Page 81

1    documents, from things that I've heard and to the

2    extent that we are compiling that, and that's a

3    separate issue.  But from that, yes.  And, of course,

4    I've spoken to Jennifer.  I speak to Jennifer every

5    day.

6         Q    Yes.

7              All right.  That's -- Is that as much detail

8    as I'm going to get today?

9         A    Yes.

10        Q    I'm not intending to badger you, I'm trying

11   to be thorough here.

12        A    No, I appreciate that.  Yes, that's as much

13   detail as I can speak to you.

14        Q    All right.  And the next claim that you can

15   remember?                          *"B" . claimant 3*

16        A    There's one that's B

17   B·

18        Q    I'll take your word for it.
                                    *"JC" - Claimant 2*
19        A    And also                .  Those are the names

20   I can remember.

21        Q                      *claimant 2*

22        A    --            .  Those are some that I remember

23   specifically.  And primarily the claims mishandling --

24   I won't say primarily, because that's not even

25   necessarily all of it, but a big part of our problem

1  was the Florida claims and having adjusters with

2  limited experience in Florida claims that are sitting

3  in Texas that deal with other states, deal with other

4  clients and miss -- you know, miss things like

5  deadlines for responding to petitions for benefits that

6  result in additional cost and fees, not following up on

7  medical on a recurring issue.

8          I'm trying to think of the name of the

9  adjuster that was one of the offenders on that.  Rosa

10  Garcia I believe is the name of one of the adjusters

11  that pops out was a problem.  And the issues reported

12  over a period of time to various people at Providence,

13  Michael McClellan, who was a claims manager, Julie

14  Salceldo -- or Salcedo, who was a claims manager early

15  on.

16     Q     These are people at Providence Property &

17  Casualty?

18     A     Correct.

19     Q     That Jennifer is telling you did not do a

20  very good job bottom line?

21     A     Yeah.  Do your job actually.  That's probably

22  a good way of putting a lot of what I understand are

23  the issues.  Them not doing their jobs, not responding

24  timely, not following up on medical, which, of course,

25  results in additional costs, not paying indemnity

1   timely or not picking it up on time to avoid incurring

2   fees and costs.

3          You have -- You have a whole host of issues

4   related to the medical care and the cost of that from

5   lack of follow-up from adjusters like Rosa Garcia who

6   just don't stay on these files.  And keep in mind we

7   have a limited--limited--staff who's catching these

8   things and looking over these adjusters' shoulders and

9   it's just with that volume of claims it's almost

10  impossible to stay on top of them.

11         MR. BARBER:  Patrick, can I interrupt you for

12         one minute?

13         MR. KERNAN:  Sure.

14         MR. BARBER:  Since we're listing some

15         Claimants here, we may want to just make a note

16         for the record that we're going to mark maybe this

17         part of the transcript as confidential so we're

18         complying with any kind of privacy or HIPAA

19         issues.

20         MR. KERNAN:  That's a good point.  I don't

21         have a problem with that at all.

22         MR. BARBER:  Okay.

23  BY MR. KERNAN:

24     Q   Let me summarize just so I've got this in one

25  place so that if we have to deal with this later.  SCI



1    today at its 30(b)(6) does not have documents in the

2    form of e-mails or letters or notes or any -- any kind

3    of documentation, number one, to reflect complaints

4    that SCI would have made to Providence Property &

5    Casualty from 2003 to 2010, correct?

6         A    Correct.

7         Q    Number -- The second thing is that SCI today

8    at its 30(b)(6) does not have any documents reflecting

9    the details of those claims that it contends was not

10   properly handled, correct?

11        A    We will not be able to produce at any point

12   much in the way of details on those claims because we

13   don't have the files.

14        Q    Okay.  Well, we can -- we can discuss that

15   issue and argue about that perhaps, but the fact of the

16   matter is today SCI does not have any details -- any

17   documents that reflect the specific claims that it

18   contends were not properly managed?

19        A    Correct.

20        Q    All right.  Let me --

21             MR. BARBER:  Patrick, can we go off record

22        for a minute.

23             MR. KERNAN:  Yeah, sure.

24             (Discussion was held off the record.)

25             (Exhibit 2 was marked.)

1    experience with insurance companies, are you familiar

2    with loss runs?

3        A    Somewhat, yeah.

4        Q    All right.  Are you aware, for example, that

5    all loss runs have to be in a particular format for

6    purposes of the various guar -- national guarantee

7    associations so that they all -- when a company goes

8    under that they all have the same format for data?  Are

9    you familiar with that?

10       A    I am not.  The loss runs that we receive and

11   have received over the years from various carriers,

12   they don't all appear the exact same.

13       Q    Okay.  Does this loss run that I've handed

14   you appear to be the kinds of loss runs that you've

15   received from Providence Property & Casualty Insurance

16   Company and Imperial Indemnity Company?

17       A    It appears similar.

18       Q    Okay.  Are you aware that those loss runs are

19   cumulative; meaning, that the most recent one has all

20   of the information going back to the beginning?

21       A    I'm aware that they are cumulative, yes.

22       Q    Have you had an opportunity to evaluate the

23   loss run that's marked Exhibit 3, Mr. Edwards?

24       A    The latest loss run I have not gone through

25   in detail.

1      Q     Has anyone in your office been assigned,

2    Jennifer or somebody in your staff been assigned to

3    evaluate those loss runs?

4      A     Yes.  This would be -- I don't know if I've

5    given her the latest one yet, but this is something

6    that Jennifer would look at with me, yes.

7      Q     All right.  As we sit here today, you're not

8    able to point to any particular Claimant on Exhibit 3

9    as a claim that SCI contends was improperly managed

10   either by Providence or Imperial before receivership or

11   by the various State Guarantee Association personnel

12   after receivership, am I correct?

13     A     I believe I mentioned the three that are --

14   the two or three that I knew off the top of my head.

15   And as far as going through each one of these on a

16   specific basis, no, I can't tell you the Claimants'

17   names for all of them.

18     Q     I was going to ask you, if we went to "A" Claimant 1

19   or "E" Claimant 3 or "J" "C" Claimant 2, am I correct that you're

20   not able to go through there and tell me what it is

21   that you believe was evidence of an improper claim

22   handling, are you, sir?

23     A     These are all summary information.  So it has

24   total med pay or total indemnity paid or total

25   reserves.  It doesn't break down individual payments,

1   it doesn't break down the fees incurred as a result of

2   responding late.  None of that information is contained

3   in this document in any sort of detailed fashion that I

4   derive anything from other than a total.

5        Q    All right.  And did you get these loss runs,

6   did SCI, on a monthly basis with invoices throughout

7   this 2003 to 2010 time period?

8        A    We did receive invoices on a periodic basis.

9   Whether or not they were always attached to the

10  invoices, I can't say for certain if they were always

11  attached, but they should have been.

12       Q    All right.  And whose job would it have been

13  to look at the invoices and the loss runs on a monthly

14  basis at SCI?

15       A    On an early -- From probably 2003 through

16  2006, these would have gone to -- maybe 2007, maybe end

17  of 2006, early 2007, the invoices would have ultimately

18  ended up with Tony Foley.  From approximately 2007

19  onward they would have ended up with Debra Hubbard,

20  D-e-b-r-a, H-u-b-b-a-r-d.

21       Q    All right.  Let me hand you under Tab 18 a

22  document, a printout of a document, that's Bates

23  Numbered 12895 to 12904 and ask you if you've seen this

24  document before.

25            Actually let me put an exhibit sticker on it.

1    This will be Exhibit 4.  It still has the same Bates

2    number reference.  Actually I don't need Exhibit 4.

3    That's my bad.  It's got a Bates number on it.  There's

4    no sense in having Linda have it as an exhibit.  So

5    that's my bad.

6            All right.  My question is, let me hand you

7    12895 through 12904, it's a spreadsheet, would you take

8    a moment to look at it and then...

9        A    Okay.

10       Q    Have you seen this document before?

11       A    I probably received it from Mark and I have

12   at least glanced at it.

13       Q    Are you aware that this document has been

14   provided to Mr. Barber in discovery?  Are you aware of

15   that?

16       A    To the best of my knowledge it has been.  It

17   looks the same or similar to what -- what was received.

18       Q    All right.  Have you been able to determine

19   whether any -- if you look on page 10 of 10, the last

20   page, you'll see various categories of payments.

21       A    Okay.

22       Q    And have you been able as the 30(b)(6)

23   witness to verify whether or not any of those numbers

24   are correct?

25       A    Our numbers don't match.

```
 1              (Break was taken.)

 2    BY MR. KERNAN:

 3         Q    As we sit here today in the middle of the

 4    afternoon on this 30(b)(6) deposition, we don't have a

 5    single document from SCI that memorializes or reflects

 6    any specific claim that has allegedly been mishandled,

 7    do we?

 8         A    It has not been produced as of yet.

 9         Q    And as we sit here today in this 30(b)(6), we

10    don't have a single document that reflects complaints

11    that you and others on the SCI staff may have made to

12    Providence Property & Casualty or Imperial Indemnity

13    and Casualty Company about a specific claim, correct?

14         A    Not here with us today.

15         Q    Okay.  So in terms of being able to look at

16    the actual empirical information about whether or not a

17    claim has been mishandled, we really don't have

18    anything to talk about at this point, correct?

19         A    Not yet.

20         Q    All right.  I have understood and -- This

21    thing about a loss history, has Staffing Concepts

22    International had a loss history number?  Help me out.

23    Is there some kind of industry number that some company

24    has an 85 on a loss history scale and another one has a

25    50 on a loss history scale, and therefore, that causes
```