```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF OKLAHOMA
 2
    STATE OF OKLAHOMA, ex rel., JOHN
 3  DOAK, INSURANCE COMMISSIONER,
    AS RECEIVER FOR PARK AVENUE
 4  PROPERTY & CASUALTY INSURANCE
    COMPANY,
 5

 6  AND

 7  STATE OF OKLAHOMA, ex rel., JOHN
    DOAK, INSURANCE COMMISSIONER,
 8  AS RECEIVER FOR IMPERIAL
    CASUALTY AND INDEMNITY
 9  COMPANY,

10                       Plaintiffs,

11  vs                                  No. 5:12-cv-00409-C

12  STAFFING CONCEPTS
    INTERNATIONAL, INC.,
13
                         Defendant(s).
14

15           DEPOSITION OF MARK D. THARP
           TAKEN ON BEHALF OF THE DEFENDANTS
16      ON AUGUST 22, 2013, BEGINNING AT 9:23 A.M.
                   IN TULSA, OKLAHOMA
17

18                       APPEARANCES:

19  On behalf of the PLAINTIFF(S):
    Patrick H. Kernan
20  NEWTON, O'CONNOR, TURNER & KETCHUM, P.C.
    15 West Sixth Street, Suite 2700
21  Tulsa, Oklahoma 74119-5426
    (918) 587-0101
22  pkernan@newtonoconnor.com

23

24  REPORTED BY:  DAVID G. HARJO, CSR RPR

25  (Appearances cont'd)
```



1  marshaling process up to and including March 18,
2  2010, which when I then showed up at Imperial as
3  well.
4       Q    Okay.  And in those acquisition of
5  physical records and computer assets, did you also
6  acquire PHI, Providence Holdings' records and
7  computer files?
8       A    No.
9       Q    Who has possession and control of them at
10 this time?
11      A    Well, let me --
12      Q    To your knowledge.
13      A    Let me answer it like this.  Imperial was
14 a resident in Frisco, Texas, at 8000 Warren Parkway.
15 Imperial's name was on that building.  Imperial's
16 records were in there.  Park Avenue Property &
17 Casualty Insurance Company's records were in there.
18 It was an insurance operation.  Insurance companies,
19 regulated entities.
20      Q    Sure.
21      A    Now, there were certain holding company
22 records that were resident there as well.
23      Q    Did you acquire possession and control of
24 them?
25      A    There were certain Providence Holdings,



```
 1  Inc. records that were resident there of which there
 2  have been some sharing of records as between
 3  Providence Holdings and the insurance operations
 4  with respect to records that more than one party has
 5  an interest in.
 6              For example, there's a federal income tax
 7  allegation agreement where tax returns are filed
 8  consolidated, so naturally PHI, Providence Holdings,
 9  Inc. and the insurance operations would both have an
10  interest in those kinds of records.  That's typical
11  in these holding company receiverships.
12              MR. SWEDLOW:  Move to strike that as
13  nonresponsive.
14       Q     (BY MR. SWEDLOW)  Did you acquire
15  possession and control of Providence Holdings, Inc.
16  records and computer files at any time?
17       A     No.
18       Q     Who had had possession and control of
19  those files while you have been assistant receiver?
20       A     The records belong to the insurance
21  companies.
22       Q     And you are in charge of all assets of
23  the insurance companies, aren't you?
24       A     Yes.
25       Q     So you are in charge of the records of
```



```
 1  Providence Holdings, Inc.?
 2       A    No.
 3       Q    Then who has possession and control of
 4  the records of Providence Holdings, Inc. as we sit
 5  here today?
 6       A    I told you that we have culled out
 7  records that belong to Providence Holdings, Inc. and
 8  given those records to Providence Holdings, Inc.
 9       Q    Who, individuals, please?
10       A    What do you mean?
11       Q    People.  People's names, please.
12       A    People's names that did what?
13       Q    That have physical possession and control
14  of those records.
15       A    I don't really know.  I mean, I passed
16  those through my counsel to Providence Holdings'
17  counsel.
18       Q    So at some point in time you did have
19  possession or control of those records in order to
20  be able to pass them along to others; is that
21  correct?
22       A    You misstated.  Make no mistake about it,
23  the insure -- the business of insurance is just
24  that.  The records that were resident in Frisco,
25  Texas, were insurance company records.  Now, does
```



1  that mean that PHI doesn't have an interest in some
2  of those records?  No.  They have an interest.  So I
3  gave them copies of records that they have an
4  interest in.
5        Q    That's not what I'm asking you, sir.  I'm
6  asking you if you have had possession or control of
7  the business records and computer files of
8  Providence Holdings, Inc.  "Yes" or "No."
9        A    No.  There are no computer files of
10 Providence Holdings, Inc., to my knowledge.
11       Q    So all of the bank records of the
12 accounts of Providence Holdings, Inc. are where?
13       A    You'll have to ask Providence Holdings,
14 Inc. that.
15       Q    Let's look at Exhibit 50, please.  Can
16 you identify what that document is?
17            MR. KERNAN:  Which book?
18            MR. SWEDLOW:  Probably volume three.
19            THE WITNESS:  Okay, I have that.
20            MR. KERNAN:  Let's take a short break.
21            (Recess at 3:33, resumed at 3:38.)
22            MR. SWEDLOW:  Are we ready to be back on
23 the record?  After a short recess --
24            MR. KERNAN:  This is -- I want to make a
25 record.  I want to make a record.  This issue of PHI



1  records is confusing and it's highly contested with
2  the PHI lawyers, Stephen Jones in particular, and I
3  want Mr. Tharp to be able to state what occurred and
4  what the status is of some PHI records that may have
5  been at some point in time intermingled with the
6  Imperial and Park Avenue records, back down in
7  Frisco, Texas.
8              THE WITNESS:  Yes.  Thank you.
9              MR. SWEDLOW:  Well, Mr. Kernan is not
10 quite yet entitled to ask questions of you, but if
11 he wants to cross-examine you after I'm done, he has
12 that privilege of doing so.  So let's stick to my
13 questions, Mr. Tharp.
14             MR. KERNAN:  Okay.  Well, I wanted him to
15 have opportunity to clear up some confusion in the
16 last couple of questions that you have asked him
17 about the PHI records.
18             MR. SWEDLOW:  Again, let me ask you, Pat,
19 to retreat to the rules that if you are going to
20 object --
21             MR. KERNAN:  If you don't want him to
22 clear it up, fine.
23             MR. SWEDLOW:  If you want to object to
24 one of my questions --
25             MR. KERNAN:  I just wanted to give him an



1  opportunity to do so, if you don't want to give him
2  that opportunity, that's fine.
3           MR. SWEDLOW:  If you are going to object
4  to a question, object to the form, but if you're
5  going to sit here and talk in a way that influences
6  the witness's testimony, then we're going to have an
7  issue.
8           MR. KERNAN:  As I said before --
9           MR. SWEDLOW:  I'm going to start asking
10 questions again and I expect you to follow the
11 rules.
12          MR. KERNAN:  As I said before, I wanted
13 to him an opportunity to clear up some of the last
14 questions and answers given.  If you don't want him
15 to do that, that's fine.
16     Q    (BY MR. SWEDLOW)  Mr. Tharp, on this
17 recess here a few moments ago, did you and counsel
18 in the hallway talk about some potential
19 misinterpretation or discrepancy in the answers you
20 gave me about whether you have or have not had
21 possession or control of Providence Holdings' books
22 and records?
23          MR. KERNAN:  Just a minute.  You don't
24 need to answer that.  That's attorney/client
25 privilege.



```
 1         Q    (BY MR. SWEDLOW)  I'm asking you if you
 2   had a conversation.  I'm not asking you to tell me
 3   what he told you yet.
 4              MR. KERNAN:  You don't have to answer
 5   that.  That's attorney/client privilege.
 6              MR. SWEDLOW:  If you are going to
 7   manipulate a witness during his deposition, I'm
 8   entitled to know.
 9              MR. KERNAN:  We took a break --
10         Q    (BY MR. SWEDLOW)  Did you have such a
11   conversation, Mr. Tharp?
12              MR. KERNAN:  Excuse me.  We took a break
13   after a question was answered.  There wasn't a
14   question pending, that's been the rules that we have
15   undergone and you are not going to ask him the
16   subject matter of what he and I talked about.
17   That's an attorney/client privilege and you are not
18   entitled to do that, and you know that.
19         Q    (BY MR. SWEDLOW)  Did you have such a
20   conversation, Mr. Tharp?  "Yes" or "No."
21              MR. KERNAN:  I'm going to object to that
22   and instruct the witness not to answer that.
23              MR. SWEDLOW:  Court reporter, certify the
24   question, please.
25         Q    (BY MR. SWEDLOW)  Mr. Tharp, do you
```



```
 1   recall your testimony before the recess that, is
 2   that you have not had access to the business records
 3   and computerized data of Providence Holdings, Inc.?
 4           MR. KERNAN:  I object to the form of the
 5   question.  That's not -- you haven't accurately
 6   stated his testimony.
 7           MR. SWEDLOW:  Again, you are making a
 8   speaking objection.  If you want to object to the
 9   form, object to the form.
10           MR. KERNAN:  You can't mislead the
11   witness, and that's not what he said.
12           MR. SWEDLOW:  You can't manipulate the
13   witness.
14           MR. KERNAN:  You cannot mislead him.
15       Q    (BY MR. SWEDLOW)  Mr. Tharp, do you
16   recall your testimony from before the recess?
17       A    Yes.
18       Q    All right.  Haven't forgotten it yet;
19   right?
20       A    I have not.
21       Q    All right.  We have an Exhibit 50, a
22   document that has been produced through your
23   counsel.  Do you see it?
24       A    Yes.
25       Q    Am I correct in thinking that this is a
```



1  summary prepared by you of payments made by Staffing
2  Concepts that appear in the books and records that
3  you have had access to as assistant receiver?
4       A    Yes.
5       Q    Okay.  On the very last page, please read
6  for me, and I know it's kind of tiny on this
7  particular format, please read for me footnote A.
8       A    "A.  Providence Holdings, Inc. ledger at
9  time of receivership indicated SCI held a surplus
10 note in preferred stock with PHI for 2,279,111 and
11 1.8 million respectfully."
12      Q    And the rest of that line?
13      A    "The assistant receiver staff did not
14 verify payments nor audit ledger activity pertaining
15 to these holding company transactions."
16      Q    Now, in light of that statement on this
17 document you prepared, have you in your capacity as
18 assistant receiver had access to Providence
19 Holdings, Inc.'s ledger?
20           MR. KERNAN:  Object to the form of the
21 question.
22           THE WITNESS:  That second part of that
23 sentence indicates that those payments cannot be
24 verified.
25      Q    (BY MR. SWEDLOW)  Have you had access to



```
 1  the ledger that's identified in this footnote?
 2       A    I'm not sure.  I have not.
 3       Q    You wouldn't write this if you hadn't
 4  seen the ledger, would you?
 5       A    I didn't write this actually, it was
 6  written by my staff member Monica Reitz.
 7       Q    So Monica Reitz had access to the ledger
 8  in order to prepare this document.  Is that correct?
 9       A    I don't know.
10       Q    She wouldn't write this if she didn't
11  have access to the ledger, would she?
12       A    Well, she had -- you know, she was -- as
13  I testified to you earlier, she was on-site there
14  pre-receivership, so I don't know what she might
15  have done for Providence Holdings, Inc., what she
16  might have seen, what she might have been privy to,
17  any of that because I wasn't there at the time, so I
18  don't know.
19       Q    When was this document created?
20       A    Recently.
21       Q    By Monica Reitz in her capacity as an
22  employee of your firm?
23       A    Yes.  Well, I would say more to the
24  point, in her capacity as part of the assistant
25  receiver and his staff.
```



```
 1       Q     And you are the assistant receiver?
 2       A     Yeah, but you said Tharp and Associates,
 3   that's less important than the fact that she's doing
 4   work for the assistant receiver.
 5       Q     All right.  She's on your firm's payroll,
 6   doing work related to the assistant receiver's job
 7   which is your job; right?
 8       A     That's right.
 9       Q     All right.  And it's your testimony that
10   she looked at the original records that are
11   summarized on this document.  Is that right?
12       A     She looked at source documents for the
13   cash receipts.
14       Q     You didn't personally do so?
15       A     I have looked at some of those, but she
16   prepared this document.
17       Q     Who made the decision not to make any
18   effort to verify the amount shown on the PHI ledger?
19       A     Well, I don't know that it was a
20   decision.  It may have just been we didn't have --
21   we were not privy to that information.
22       Q     Have you, in your role, examined any
23   actual workers' compensation claim files?
24       A     I believe I have, yes.
25       Q     Can you identify which claim files you
```

