# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| STATE OF OKLAHOMA, *ex rel.* JOHN DOAK, INSURANCE COMMISSIONER, AS RECEIVER FOR PARK AVENUE PROPERTY& CASUALTY INSURANCE COMPANY | ) ) ) ) ) | |
| AND | ) ) | Case No. 5:12-cv-00409-C |
| STATE OF OKLAHOMA, *ex rel.* JOHN DOAK, INSURANCE COMMISSIONER, AS RECEIVER FOR IMPERIAL CASUALTY | ) ) ) ) | |
| AND INDEMNITY COMPANY, | ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| STAFFING CONCEPTS INTERNATIONAL, INC., | ) ) ) | |
| Defendant. | ) | |

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT STAFFING CONCEPTS INTERNATIONAL, INC.'S CERTIFICATION OF DISCOVERY PROGRESS AND <u>REQUEST FOR EVIDENTIARY OR FURTHER DISCOVERY RULING</u>

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................ i

INDEX OF AUTHORITIES ................................................................................ ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENTS AND AUTHORITY .................................................................... 3

PROPOSITION I – Defendant had the opportunity to challenge "claims mismanagement" after receipt of the 93 invoices it received from the insurers. It elected not to do so. Defendant has waived its right and should be estopped from asserting "claims management" at this time. ............................................................ 3

A. The insurers sent Defendant invoices on a monthly or bi-monthly basis from May 2003 through April 2010.  Defendant never asserted claims mismanagement in response to any invoice received.. .......................................................................... 3

B.  Defendant had every opportunity to know about the monies expended on each workers' compensation claim, complain about alleged excessive payments and charges, and seek a credit from the insurers, but it elected not to do so. .................... 5

C.  Defendant repeatedly and routinely agreed with the insurers with regard to the money owed by Defendant under the invoices it received. It acknowledged routinely the amounts owed at a given point in time and sought only additional credit extensions from the insurers to pay the amounts it owed. Again, Defendant never asserted claims mismanagement as a basis for seeking payment plans from the insurers to pay the amounts it owed. ................................................................. 7

D. The law regarding waiver and estoppel supports the Receiver's position. .......... 13

PROPOSITION II – The provisions of OKLA. STAT. tit. 36, § 1924.1 (D) and (E) preclude Defendant from attempting to assert alleged negligence in claims handling as a defense to the amount owed the Receiver under the insurance contracts. ............................................................................................................ 16

PROPOSITION III – Pursuant to OKLA. STAT. tit. 36, § 2010, Defendant is prohibited from challenging the payments and settlements of the guaranty associations. ...................................................................................................... 18

CONCLUSION .............................................................................................................. 20

CERTIFICATE OF SERVICE.......................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Apex Siding & Roof Co. v. First Fed. Sav. & Loan Ass'n of Shawnee*, 301 P.2d 352, 355

   (Okla. 1956). ................................................................................................ 15

Barringer v. Baptist Healthcare, 2001 OK 29, 22 P.3d 695, 700-01 (Okla. 2001) ........... 13

Bay Petroleum Corp. v. May, 1953 OK 370, 264 P.2d 734, 736 (Okla. 1953) ................ 13

*Dixon v. Roberts*, 1993 OK CIV APP 15, 853 P.2d 235 ..................................................... 14

First State Bank v. Diamond Plastics Corp., 1995 OK 21, 891 P.2d 1262, 1272 (Okla.

   1995). ................................................................................................................ 14

*First State Bank v. Diamond Plastics Corporation*, 1995 OK 21, 891 P.2d 1262............ 14

*Lacy v. Wozencraft*, 105 P.2d 781, 783 (Okla. 1940)......................................................... 14

*McDowell v. Cagle*, 240 P.2d 783 (Okla. 1951) ................................................................. 16

*Oklahoma Natural Gas Co. v. Oneok*, No. 01-CV-95-H(C), 2002 U.S. Dist. LEXIS

   27756 (N.D. Okla. Sept. 12, 2002) ................................................................ 13

*Oklahoma Oil & Gas Exploration Drilling Program v. W.M.A. Corporation*, 1994 OK

   CIV APP 11, 877 P.2d 605 ............................................................................. 15

*Penny v. Giuffrida*, 897 F.2d 1543 (10th Cir. 1990). ......................................................... 15

*Skandia Am. Reinsurance Corp. v. Schenck*, 441 F. Supp. 715, 727-728 (S.D.N.Y. 1977)

   .......................................................................................................................... 19

*United States v. GasTech Eng'g Corp.*, No. 99-CV-0026-E(J), 2001 U.S. Dist. LEXIS

2285 at **9-11 (N.D. Okla. Jan. 25, 2001)...................................................................... 13

## Statutes

OKLA. STAT. tit. 36 § 1924.1 (D) and (E) ............................................................. 2, 16, 17

OKLA. STAT. tit. 36 § 2010 .......................................................................................... 2, 18

OKLA. STAT. tit. 36, § 2010(D).......................................................................................... 19

STAT. tit. 36, § 2010(C) ..................................................................................................... 18

The State of Oklahoma, *ex rel.* John Doak, Insurance Commissioner, as Receiver for Park Avenue Property & Casualty Insurance Company and the State of Oklahoma, *ex rel.* John Doak, Insurance Commissioner, as Receiver for Imperial Casualty and Indemnity Company (the "Receiver") submits his Response to Defendant Staffing Concepts International, Inc.'s Certification of Discovery Progress and Request for Evidentiary or Further Discovery Ruling (Dkt. No. 78), and respectfully requests the Court deny Defendants' Request.  In support of his position, the Receiver submits the following:

## PRELIMINARY STATEMENT

After compelling the Receiver to retrieve and turn over 65,000 pages from 103 claim files selected by Defendant not including electronic records, over 15,000 cancelled checks written on the 1852 claim files from 2003 to 2010, almost 11,500 emails between the insurers and Defendant, loss runs going back to 2003, and thousands of other bits and pieces of electronic data on minuscule irrelevant issues, it is clear what Defendant wants to do with this litigation: make it so expensive, time consuming, and complicated that the Receiver will capitulate regardless of the merits of Defendant's complaints.[1]

Defendant should not be allowed as a matter of law to turn this litigation into 103 (or 1852) *mini*-trials over 'claims handling' issues for the following reasons:

---

[1] SCI has employed this tactic with regard to its ongoing litigation with prior large deductible workers' compensation insurer, CNA.  As previously addressed in the Receiver's Motion to Compel, Defendant has fought for seven years over claims handling both on the merits and on procedural issues (Dkt. No. 52 at 3-4).

1.     Defendant received from 2003 to 2010 in excess of 93 invoices from the insurers for payment on a monthly and sometimes twice monthly basis.   Defendant's witnesses testified Defendant never, in all those years and after all those invoices, alleged, contended, or asserted even one single payment or expense charged on the 1852 workers compensation claim files was excessive or not authorized.[2]   Defendant's witnesses confirmed Defendant never refused to pay an invoice because of an excessive payment on a claim file or excessive charge to a claim file.

2.     Defendant SCI and Receiver's insurers, on numerous occasions between 2003 and 2010, *agreed* that specific amounts were due and owing as of certain dates.   The communications related to the amounts owed pertained to extensions of time or payment terms for monies due and were not related to assertions Defendant was entitled to credits for claims handling issues.   Defendant should not be allowed to litigate at this late date actions which occurred prior to those various acknowledgements of amounts owed.

3.     The provisions of OKLA. STAT. tit. 36 § 1924.1 (D) and (E) preclude Defendant from attempting to assert alleged negligence in claims handling as a defense to the amount owed Receiver under the insurance contracts.

4.     The highest dollars of Defendant's complaints relate to claims administered by the guaranty associations.  Pursuant to OKLA. STAT. tit. 36 § 2010, Defendant is prohibited from challenging the payments and settlements of the guaranty associations.

Defendant should not be allowed to further delay and obfuscate the legitimate trial

for monies owed under the insurance contracts with an examination of the additional

---

[2] The Receiver found one exception to this rule.  In 2005, Defendant challenged $110 of penalties that were to be assessed for late reporting of claims (Dkt. No. 81-1).   Park Avenue agreed to bear responsibility for these penalties (*Id.*).  Defendant obviously had the ability and knowledge necessary to respond to charges during the course of the relationship, and apparently no amount was too small.  It should not be allowed a second bite at the apple now.

1750 claim files.[3]  Further, the alternative suggestion from Defendant that it be allowed to extrapolate the jury's findings regarding credits for alleged claims mishandling from the 103 claim files it has unilaterally selected is devoid of merit.   Defendant selected a sample of files it believes would result in the largest and most frequent credits against the legitimate monies owed to the Receiver.   Defendant admits the sample is not random. Even if allowed under the law, Defendant does not offer any authoritative, mathematical, or scientific basis for its proposal to extrapolate the credits due to the entire population of workers' compensation claims.

## ARGUMENT AND AUTHORITIES

### I.

**Defendant had the opportunity to challenge "claims mismanagement" after receipt of the 93 invoices it received from the insurers.  It elected not to do so.  Defendant has waived its right and should be estopped from asserting "claims mismanagement" at this time.**

**A. The insurers sent Defendant invoices on a monthly or bi-monthly basis from May 2003 through April 2010 (Dkt. No. 79 at 6-11).  Defendant never asserted claims mismanagement in response to any invoice received.**

On July 23, 2013, the Receiver took the 30(b)(6) testimony of Defendant SCI. This testimony is ***binding*** on Defendant.  *See* the Receiver's Discussion in its Objection and Motion to Strike Designated Expert Witness Jennifer Johns (Dkt. No. 53 at 4-7).  Its designated representative testified as follows:

---

[3] This would result in hundred of thousands of additional pages to be reviewed by Defendant once again (it reviewed these files repeatedly through the relationship) and delay of trial for months just to allow claims files to be copied.

-3-

a.    SCI is not able to identify one document that reflects even a ***complaint*** about excess charges or unnecessary payments made on a workers compensation claim. Deposition of William Edwards ("Edwards Depo.") at 71-78, and 181 (Dkt. No. 81-2).

b.    All Defendant's clients (co-employers) received workers compensation coverage from the insurers. Edwards Depo. at 87 (Dkt. No. 81-2).

c.    The insurers paid all workers compensation claims (1,852) submitted by Defendant. Edwards Depo. at 65-66, and 87 (Dkt. No. 81-2).

d.    SCI had no invoices from the insurers in policy years 2003, 2004, 2005, 2006, 2007, 2008, 2009, and 2010 that it refused to pay because of alleged negligent claims handling. Edwards Depo. at 71-78 (Dkt. No. 81-2).[4]  Defendant was aware of changes to the amounts incurred, and investigated those changes when it chose to do so. *See, e.g.,* April 9, 2007, email from Henry Hardin to Chris Sullivan (Dkt. No. 81-4).

e.    As recent as the first quarter of 2010, when negotiating a contract renewal commencing April 30, 2010, Defendant makes no reference or indication of refusal to make invoice payments, past or present, based on alleged negligent claims handling, but instead emphasizes how much Defendant wants to continue doing business with the insurers. Exhibits 11, 12, 13, & 14 to the Edwards Depo. (Dkt. No. 81-5); Edwards Depo. at 161-165 (Dkt. No. 81-4).

---

[4] On page 78 of the Deposition, Mr. Edwards references a doubling of the invoices that occurred due to a technical glitch in how Defendant pulled the loss run data. The issue was subsequently resolved (Dkt. No. 81-3).

The July 23, 2013, testimony of Defendant's 30(b)(6) designated witness, William Edward's Jr., should be binding on Defendant with regard to alleged claims handling issues as specifically identified in the 30(b)(6) Notice (Dkt. No. 53-1, ¶¶ 1(d), 1(e), 1(k), 4, 5, 6, and 8).[5]   However, Defendant ignored its obligations under 30b6 and attempted to take a second bite of the apple by naming Jennifer Johns, an employee of an apparent affiliated entity, to provide testimony about alleged negligent claims handling.[6]

**B. Defendant had every opportunity to know about the monies expended on each workers' compensation claim, complain about alleged excessive payments and charges, and seek a credit from the insurers, but it elected not to do so.**

On September 11, 2013, Jennifer Johns was deposed.  She testified as follows:

a.    SCI 'Claims Professional' personnel and Providence/Imperial claims adjusters would communicate about claim files primarily by email and telephone. Telephone was more 'effective', and the ratio between emails and telephone calls was "50-50". Deposition of Jennifer Johns ("Johns Depo.") at 49-50 (Dkt. No. 81-6).[7]   The Receiver has listed approximately 3,339 emails between Defendant and the insurers related to claims handling.  (See the Receiver's Exhibits 1429-4768 (Dkt. No. 79-1). This does not include the emails regarding claims handling listed by the Defendant.

---

[5] (*See also* Dkt. 52 at 4-7).

[6] The Receiver has filed an objection to Defendant's designation of Jennifer Johns as an expert witness (Dkt. No. 53).

[7] The exhibits listed by Defendant and Plaintiff in this case include approximately 11,500 emails that were exchanged between the parties.

b.      SCI had as many as eight and as few as four "Claims Professionals" assigned to Providence/Imperial files to monitor and interface with Providence/Imperial claims adjusters.  Johns Depo. at 79-83 (Dkt. No. 81-6).

c.      SCI had internet computer access to all claim files at all times,[8] including ability to review actual payments made in a claim file.  Johns Depo. at 66-69, 104-105, 147-149 (Dkt. No. 81-6).

d.      SCI would participate in actual personal visits to Providence/Imperial offices in Frisco, Texas when there were "pending issues" regarding claims handling. Johns Depo. at 49-50 (Dkt. No. 81-6).

e.      SCI personnel, including Jennifer Johns, conducted a physical, actual, claim file audit or review at Providence/Imperial offices in Frisco, Texas on at least four occasions in February 2005, 2006, 2007, and 2008.  Perhaps more.  Johns Depo. at 47, 122-125 (Dkt. No. 81-6).

f.      In addition to physical on-site claims audits and reviews, SCI claims personnel routinely engaged in telephonic claim reviews with Providence/Imperial. Johns Depo. at 119-120 (Dkt. No. 81-6).

g.      Ms. Johns testified that, with regard to payments on a claim, the ***insurer*** (Park Avenue/Imperial) – not the insured (SCI) – is entitled to make the final decision on the validity and amount of payments.  Johns Depo. at 115-116 (Dkt. No. 81-6).

---

[8] Ms. Johns did reference some occasions of system outages for software system maintenance.

h.     Throughout the contract period between 2003 and until the Park Avenue receivership in November 2009 and the Imperial receivership in May 2010, SCI never once refused to pay an invoice or demanded credit or money back because of alleged improper claims handling and/or overpayment of an expense related to a claim.  Johns Depo. at 132-135 (Dkt. No. 81-6).

i.     Jennifer Johns has been designated to provide expert testimony about the following issues: (1) duplicate payments (2) erred indemnity payments (3) payments issued without supporting records (4) overpayments to medical providers, defense attorneys, and vendors (5) unnecessary litigation costs.  ***These are the exact same allegations she made against CNA in SCI's litigation to get out of paying monies owed CNA under workers compensation insurance contracts entered into between January 2000 and April 2003***.  Johns Depo. at 193-194 (Dkt. No. 81-6).  Because Defendant litigated and continues to litigate the exact same issues with CNA, Defendant had a heightened awareness of these issues to ensure they did not develop with the insurers.

**C.  Defendant repeatedly and routinely agreed with the insurers with regard to the money owed by Defendant under the invoices it received.  It acknowledged routinely the amounts owed at a given point in time and sought only additional credit extensions from the insurers to pay the amounts it owed.  Again, Defendant never asserted claims mismanagement as a basis for seeking payment plans from the insurers to pay the amounts it owed.**

In addition to periodic invoicing, the parties engaged in multiple communications regarding payment of past due amounts.  Attached are communications between

Defendant and the insurers related to agreements for repayment of amounts due and owing at various times during the seven-year relationship:

a.      2004-(1) – May 17-18, 2004, emails between Derek Lancaster and Tony Foley confirming balance due on paid claims for policy year 2003 and payment terms for past due amounts (Dkt. No. 81-7).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

b.      May 19, 2004, Letter Agreement signed by J.C. Dominguez, President of SCI memorializing agreement for payment of past due amounts (Dkt. No. 81-8).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

c.      October 18-21, 2004, emails between J.C. Dominguez and Derek Lancaster regarding payment terms for Invoice 34 (Dkt. No. 81-9).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

d.      April 20-26, 2005, emails between Derek Lancaster and J.C. Dominguez regarding payment of amounts due and owing and payment terms for unpaid balances (Dkt. No. 81-10).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

e.      December 2-15, 2005, emails between Derek Lancaster and J.C. Dominquez regarding payment of outstanding amounts (Dkt. No. 81-11).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

f.      February 9, 2006, emails among Toney Foley, Henry Hardin, and Derek Lancaster regarding payment plan for amounts due (Dkt. No. 81-12). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

g.      May 10, 2006, email agreement between Derek Lancaster and Henry Hardin regarding installment payments past due amounts (Dkt. No. 81-13).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

h.      May 22 – June 20, 2006, emails among Derek Lancaster, Dan Klimek, and Henry Hardin reflecting an agreement to all monies due through May 1, 2006, and an agreement for installment payments (Dkt. No. 81-14). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

i.      July 31-August 2, 2006, emails among Dan Klimek, Henry Hardin, and Derek Lancaster acknowledging amounts due and agreement to pay past due amounts (Dkt. No. 81-15). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

j.      January 8-17, 2007, emails among Dan Klimek, Henry Hardin, and Derek Lancaster confirming the amounts due and payment plan for incurred claims (Dkt. No. 81-16). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

k.      May 1-2, 2007, emails among Henry Hardin, Derek Lancaster, and Steve Gober regarding amounts due and payment agreement (Dkt. No. 81-17).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

l.      September 5-18, 2007, emails among Dan Klimek, Monica Reitz, and Derek Lancaster regarding acknowledgment and payment of overdue amounts (Dkt. No. 81-18). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

m.      November 7-20, 2007, emails between Henry Hardin and Derek Lancaster regarding amounts due and owing (Dkt. No. 81-19).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

n.      February 4-11, 2008, emails among Henry Hardin, Dan Klimek, and Derek Lancaster acknowledging all past due invoices through January 31, 2008 (Dkt. No. 81-20).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

o.      March 7-10, 2008, emails among Liza Hinlo, Derek Lancaster, and Henry Hardin acknowledging all sums due and owing and agreement to accelerate payments for past due amount of $1,230,208.18 to be paid in full in the next three to four months (Dkt. No. 81-21).  No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

p.      May 20-23, 2008, emails among Monika Reitz, Derek Lancaster, and Dan Klimek regarding payment of outstanding amounts due and Defendant's agreement to

pay by month end (Dkt. No. 81-22). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

q.     May 23-June 4, 2008, emails among Monika Reitz, Derek Lancaster, and Henry Hardin regarding unpaid balance, acknowledgment of amount due, and representation that money has been sent (Dkt. No. 81-23). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

r.     August 6-26, 2008, emails among Liza Hinlo, Monika Reitz, Derek Lancaster, Dan Klimek, Chris Sullivan, Henry Hardin, and Jennifer Johns regarding $246,740.46 overdue payments and statement from Henry Hardin that he assumed money had been paid (Dkt. No. 81-24). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

s.     October 6-8, 2008, emails between Chris Sullivan and Derek Lancaster requesting special payment procedures employed for new incurred amounts (Dkt. No. 81-25). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

t.     October 13-27, 2013, emails among Chris Sullivan, Derek Lancaster, and Monika Reitz regarding payment schedule for large reserve postings (Dkt. No. 81-26). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

u.      December 18-22, 2008, emails between Henry Hardin and Derek Lancaster acknowledging sums are overdue (Dkt. No. 81-27). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

v.      January 8-15, 2009, emails between Henry Hardin and Derek Lancaster acknowledging outstanding balance and proposal for weekly payment plan (Dkt. No. 81-28). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

w.      May 11-18, 2009, emails between Derek Lancaster and Henry Hardin relating to invoices accruing faster than weekly payment plan and missed payments (Dkt. No. 81-29). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

x.      July 8-15, 2009, emails between Derek Lancaster and Henry Hardin advising Defendant its outstanding balance is growing, demand from Park Avenue for immediate payment, and Hardin's representation to place more business with Imperial (Dkt. No. 81-30). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

y.      October 14, 2009, letter from Dan Klimek to Derek Lancaster requesting reapplication of payments from amounts due to Park Avenue to amounts subsequently incurred from Imperial (Dkt. No. 81-31). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

z.     October 12-13, 2009, emails between Chris Sullivan and Steve Gober regarding outstanding amounts due and waiting to see how funds are reapplied before Defendant "immediately schedule[s] something on the balance" (Dkt. No. 81-32). No demand was made for credit due to alleged claims mishandling or improper or unsupported payments.

### D. The law regarding waiver and estoppel supports the Receiver's position.

If Defendant had a legitimate issue with claims handling or payments made on claims, it would have addressed the issue contemporaneously with the invoices, and it certainly would not have renewed its agreements multiple times. *See United States v. GasTech Eng'g Corp.*, No. 99-CV-0026-E(J), 2001 U.S. Dist. LEXIS 2285 at **9-11 (N.D. Okla. Jan. 25, 2001) (granting summary judgment to IRS as successor in interest to creditor on receivable account where debtor did not object to creditor regarding invoices issued and gave no explanation for failing to do so).

In *Oklahoma Natural Gas Co. v. Oneok*, No. 01-CV-95-H(C), 2002 U.S. Dist. LEXIS 27756 (N.D. Okla. Sept. 12, 2002), the court defined waiver and estoppel as follows:

> Waiver and estoppel are two different doctrines that Apache has asserted as affirmative defenses to ONG's contract claim. *See Bay Petroleum Corp. v. May,* 1953 OK 370, 264 P.2d 734, 736 (Okla. 1953) (explaining distinction between waiver and estoppel). "Waiver is the voluntary and intentional relinquishment of a known right." *Barringer v. Baptist Healthcare,* 2001 OK 29, 22 P.3d 695, 700-01 (Okla. 2001).
> …
> Estoppel is generally understood to prevent one party from taking a legal position which is inconsistent with an earlier action that places the other

party at a disadvantage. *See First State Bank v. Diamond Plastics Corp.,* 1995 OK 21, 891 P.2d 1262, 1272 (Okla. 1995).

In *Dixon v. Roberts*, 1993 OK CIV APP 15, 853 P.2d 235, the court addressed estoppel by silence.  In that case, the parties changed a prior agreement through oral conversations confirmed by one of the parties in writing.  *Id.* at 236.  When sued, the defendant claimed the original contract should prevail. *Id.* at 238.   However, the defendant admitted receiving the letter, and the court recognized the writing as a modification of the contract.   *Id.*   The court cited the Oklahoma Supreme Court as follows:

> So-called promissory estoppel is recognized in many jurisdictions.  It is based upon the same equitable principles as is estoppel by silence.  In the one case a promise made with the intention that it be acted upon by the promisee; in the other, a person ahs been silent on some occasion when he should have spoken.  But in either case the party who is estopped has in effect stood by and, in violation of his duty in equity and good conscience to warn another of the real facts, permitted the latter to take some action detrimental to his own interest.

*Id.* (quoting *Lacy v. Wozencraft*, 105 P.2d 781, 783 (Okla. 1940) (internal citations omitted).

In *First State Bank v. Diamond Plastics Corporation*, 1995 OK 21, 891 P.2d 1262, the Oklahoma Supreme Court reversed the district court decision that the defendant bank was not liable on a letter of credit it issued to the plaintiff because the letter of credit did not strictly comply with the terms of presentment contained the letters of credit. However, the Oklahoma Supreme Court held that there was a fact question as to whether the defendant bank should be estopped from asserting its right to require strict

-14-

compliance with the terms of the letters of credit by its previous conduct.  In so holding the court stated:

> Estoppel is generally understood to prevent one party from taking a legal position which is inconsistent with an earlier action that places the other party at a disadvantage. *Penny v. Giuffrida*, 897 F.2d 1543 (10th Cir. 1990). This Court has explained the doctrine of equitable estoppel as follows: Equitable estoppel is the result of the voluntary conduct of a party whereby he is absolutely precluded from asserting rights which might have otherwise existed as against a person who, in good faith, relied on such conduct and has been thereby led to change his position to his detriment, and who has acquired some corresponding right. It holds a person to a representation made, or a position assumed, where otherwise inequitable consequences would result to another, who, having a right to do so under the circumstances, has in good faith, relied thereon. Whether the doctrine of equitable estoppel is applicable depends on the facts and circumstances of each case." *Apex Siding & Roof Co. v. First Fed. Sav. & Loan Ass'n of Shawnee*, 301 P.2d 352, 355 (Okla. 1956).

*Id.* at 1272.

In *Oklahoma Oil & Gas Exploration Drilling Program v. W.M.A. Corporation*, 1994 OK CIV APP 11, 877 P.2d 605, the court of appeals affirmed the trial court decision holding that the plaintiffs were estopped to deny the status of the defendant as the operator of certain oil and gas wells because the plaintiffs had paid their portion of expenses under a joint operating agreement.  *Id.* at 608-609.  The court stated the applicable legal precept as follows:

> Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person who has in good faith relied upon such conduct and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract or of remedy.

-15-

*Id.* (quoting *McDowell v. Cagle*, 240 P.2d 783 (Okla. 1951)).

As testified by Defendant's own witness, Defendant never asserted improper claims handling by the insurers. Instead, on myriad occasions, Defendant received additional extensions of time to pay invoices or pay in installments. In essence, even assuming *arguendo*, Defendant had some legitimate complaints about claims mishandling so substantial as to entitle it to a credit against money owed under the insurance contracts, it elected to waive its right to assert those claims in lieu of its decision to seek and obtain more lenient credit terms from the insurers. As set forth above, Defendant sought such terms time after time. Had Defendant raised these alleged claims mishandling issues at the time at or shortly after they supposedly occurred, they could have been addressed in a logical and coherent manner by the insurers. Indeed, this is exactly what happened on the **one occasion** when Defendant sought a credit of $110 for an alleged improper claim payment (Dkt. No. 81-1). Obviously, had Defendant chosen to assert hundreds of thousands of dollars in alleged claims mishandling credits, two things would have happened: (1) the allegations could have been addressed and resolved at the time the issues were raised and (2) the Defendant would not have granted repeated extensions of time to pay the amounts owed under the insurance contracts.

## II.
**The provisions of OKLA. STAT. tit. 36, § 1924.1(D) and (E) preclude Defendant from attempting to assert alleged negligence in claims handling as a defense to the amount owed the Receiver under the insurance contracts.**

-16-

Okla. Stat. tit 36, § 1924.1(D) and (E) provide, in relevant part, as follows:

D. ***An allegation by the receiver of improper or fraudulent conduct*** against any person shall not be the basis of a defense to the enforcement of a contractual obligation owed to the insurer by a third party, but the third party is not barred by this section from seeking to establish independently as a defense that ***the conduct*** was materially and substantially related to the contractual obligation for which enforcement is sought.

E. ***No prior wrongful or negligent actions*** of any present or former officer, manager, director, trustee, owner, ***employee*** or ***agent*** of the insurer may be asserted as a defense to a claim by the receiver under a theory of estoppel, comparative fault, intervening cause, proximate cause, reliance, mitigation of damages or otherwise; except that the affirmative defense of fraud in the inducement may be asserted against the receiver in a claim based on a contract[.] Evidence of fraud in the inducement will be admissible only if it is contained in the records of the insurer.

*Id.* (emphasis added).   The Oklahoma legislature has mandated a system for the collection by a receiver of monies owed to an insolvent insurance company. The mandated system requires the receiver to do the following:

a.   collect monies owed to the insurance company by third parties under contracts (this includes monies owed in this case by an insured under insurance contracts); and

b.   aggressively pursue and attempt to collect all monies due the insurance company by officers, directors, and employees who may have wrongfully damaged the insurance company.

With regard to the ***single issue at hand*** – whether the Defendant should be allowed to litigate 1,852 "claims mismanagement" cases – section 1924.1(D) and (E) clearly ***disallows*** the litigation of a credit for monies owed under the insurance contracts

for wrongful or negligent conduct of the insurers' adjusters.   As the receiver has not

alleged improper or fraudulent conduct by the insurers' adjusters – and he has not –

Defendant is limited to proving fraudulent inducement from the records of the insurer.

### III.
### Pursuant to OKLA. STAT. tit. 36, § 2010, Defendant is prohibited from challenging the payments and settlements of the guaranty associations.

Though not apparent from Defendants' Request for Discovery ruling, a large

portion of the amount for which Defendant complains are not payments made by the

insurers.   Rather, Defendant complains to a large part that payments made by the

guaranty associations are "unsupported" or are otherwise suspicious.

As a matter of law, neither Defendant nor the Receiver is entitled to challenge the

payments made by the state guaranty associations post-receivership. The guaranty

associations of the various states administer outstanding or "open" workers'

compensation claims incurred prior to cancellation of the policies, which occurs in

connection with an order of liquidation of an insurance company.   In addition to making

payments on claims, the guaranty associations set case reserves on open claims.   The

determinations of the guaranty associations are binding.   OKLA. STAT. tit. 36, § 2010(C)

provides, in relevant part, as follows:

> The receiver, liquidator or statutory successor of an insolvent insurer shall
> be bound by settlements of covered claims by the Association or a similar
> organization in another state.

*Id.* Further, subsection (D) provides as follows:

> The Association shall periodically file with the receiver or liquidator of the insolvent insurer statements of the covered claims paid by the Association and estimates of anticipated claims on the Association which shall preserve the rights of the Association against the assets of the insolvent insurer.

OKLA. STAT. tit. 36, § 2010(D).

The Receiver is not entitled to so challenge the settlements, reserve calculations, and payments of the guaranty associations, and the statements filed by the guaranty associations, including case reserves, are all that is needed to preserve a claim of the guaranty association for the amounts so stated. *Id.* It stands to reason that Defendant is also bound by the settlements of the guaranty association or the reserves on open claims up to the per-claim deductible. To hold otherwise would obligate the Receiver to pay the full amount of the claims submitted by the guaranty associations, but only recover a portion of the claim paid from Defendant within its deductible. This interpretation would frustrate the purpose of the act and allow preferential treatment for Defendant and a smaller liquidation dividend to the insurers' general creditors. See *Skandia Am. Reinsurance Corp. v. Schenck*, 441 F. Supp. 715, 727-728 (S.D.N.Y. 1977) (citing New Jersey's version of section OKLA. STAT. tit. 36, § 2010 in recognizing the equitable nature of liquidation proceedings to avoid preferences that would provide smaller liquidation dividends to the insolvent insurers other creditors). Accordingly, Defendant cannot challenge the determinations of the guaranty associations.

Defendant's analysis is also skewed by comparison of "apples and oranges." Approximately $200,000 of its issues are due to the simple and easily prevented mistake

of comparing a loss run dated December 31, *2012*, with UDS data through only December 31, *2011*. Additionally, though Defendant has broken down its complaints by claimant among the 103 files reviewed, it has, in large part, made no attempt to specify how the payments are "unsupported." The Receiver has provided a preliminary analysis of the claims at issue, which delineates the claimants, date of injury, closed date (if applicable), and other data (Dkt. No. 81-33).

## CONCLUSION

The Receiver respectfully requests the Court deny Defendant's Request for Evidentiary or Further Discovery Ruling. The Receiver further requests such additional relief, at law or in equity, the Court deems proper.

Respectfully submitted,

NEWTON, O'CONNOR, TURNER & KETCHUM, P.C.

*/s/ Patrick H. Kernan*
John M. O'Connor, OBA No. 6741
Patrick H. Kernan, OBA No. 4983
Gregory P. Reilly, OBA No. 22284
15 West Sixth Street, Suite 2700
Tulsa, Oklahoma  74119-5423
Telephone: 918-587-0101
Facsimile: 918-587-0102


**ATTORNEYS FOR PLAINTIFF, STATE OF OKLAHOMA,** *ex rel.* **JOHN DOAK, INSURANCE COMMISSIONER**

-20-

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of October, 2013, a true and correct copy of the above and foregoing instrument was electronically transmitted to the Clerk of the Court using the ECF system for filing and transmittal of notice of electronic filing to the following ECF registrants:

Mark M. Barber, Esq.

Leif E. Swedlow, Esq.

*/s/ Patrick H. Kernan*
Patrick H. Kernan